The court reconsidered this case en banc in order to determine whether an arbitration award must be vacated for “evident partiality,” 9 U.S.C. § 10(a)(2), where an arbitrator failed to disclose a prior professional association with a member of one of the law firms that engaged him. We conclude that the Federal Arbitration Act (“FAA”) does not mandate the extreme remedy of vacatur for nondisclosure of a trivial past association, and we reverse the district court’s contrary judgment, but it is necessary to remand for consideration of appellee’s other objections to the arbitral award.
BACKGROUND
The facts are undisputed. In January 2001, New Century Mortgage Corporation (“New Century”) licensed an automated software support program from Positive Software Solutions, Inc. (“Positive Software”). In December 2002, during negotiations for a renewal of that license, Positive Software alleged that New Century copied the program in violation of the parties’ agreement and applicable copyright law. Positive Software then filed this lawsuit against New Century in the Northern District of Texas alleging breach of contract, misappropriation of trade secrets, misappropriation of intellectual property, copyright infringement, fraud, and other causes of action. Positive Software sought specific performance, money damages, and injunctive relief.
In April 2003, the district court granted Positive Software’s motion to preliminarily enjoin New Century from using the program and, pursuant to the parties’ contract, submitted the matter to arbitration. Following American Arbitration Association (“AAA”) procedures, the AAA provided the parties with a list of potential arbi *280 trators and asked the parties to rank the candidates. After reviewing biographical information, the parties selected Peter Shnrn to arbitrate the case, as he had the highest combined ranking. The AAA contacted Shurn about serving as an arbitrator, and he agreed, after stating that he had nothing to disclose regarding past relationships with either party or their counsel.
After a seven-day hearing, Shurn issued an eighty-six page written ruling, concluding that New Century did not infringe Positive Software’s copyrights, did not misappropriate trade secrets, did not breach the contract, and did not defraud or conspire against Positive Software. He ordered that Positive Software take nothing on its claims and granted New Century $11,500 on its counterclaims and $1.5 million in attorney’s fees.
Upon losing the arbitration, Positive Software conducted a detailed investigation of Shurn’s background. It discovered that several years earlier, Shurn and his former law firm, Arnold, White, & Durkee (“Arnold White”), had represented the same party as New Century’s counsel, Susman Godfrey, L.L.P., in a patent litigation between Intel Corporation and Cyrix Corporation (“the Intel litigation”). One of Susman Godfrey’s attorneys in the New Century arbitration, Ophelia Camiña, had been involved in the Intel litigation.
The Intel litigation involved six different lawsuits in the early 1990s. Intel was represented by seven law firms and at least thirty-four lawyers, including Shurn and Camiña. The dispute involved none of the parties to the arbitration. Camiña participated in representing Intel in three of the lawsuits from August 1991 until July 1992, although her name remained on the pleadings in one of the cases until June 1993. In September 1992, Shurn, along with twelve other Arnold White attorneys, entered an appearance in two of the three cases on which Camiña worked. Although their names appeared together on pleadings, Shurn and Camiña never attended or participated in any meetings, telephone calls, hearings, depositions, or trials together.
Positive Software filed a motion to vacate the arbitration award, alleging that the award had been procured by fraud, Shurn had manifestly disregarded applicable laws, and, despite the lack of contact between Shurn and Camiña, Shurn had been biased, as evidenced by his failure to disclose his past connection to Camiña. In September 2004, the district court granted Positive Software’s motion and vacated the award, finding that Shurn failed to disclose “a significant prior relationship with New Century’s counsel,” thus creating an appearance of partiality requiring vacatur. Positive Software Solutions, Inc. v. New Century Mortgage Corp., 337 F.Supp.2d 862, 865 (N.D.Tex.2004). New Century appealed, and a panel of this court affirmed the district court’s vacatur on the ground that the prior relationship “might have conveyed an impression of possible partiality to a reasonable person.” Positive Software Solutions, Inc. v. New Century Mortgage Corp., 436 F.3d 495, 504 (5th Cir.2006). Neither the district court nor the appellate panel found that Shurn was actually biased toward New Century. This court granted New Century’s petition for rehearing en banc.
DISCUSSION
To assure that arbitration serves as an efficient and cost-effective alternative to litigation, and to hold parties to their agreements to arbitrate, the FAA narrowly restricts judicial review of arbitrators’ awards. The ground of vacatur alleged here is that “there was evident partiality” *281 in the arbitrator.[1] The meaning of evident partiality is discernible definitionally and as construed by the Supreme Court and a number of our sister circuits.
On its face, “evident partiality” conveys a stern standard. Partiality means bias, while “evident” is defined as “clear to the vision or understanding” and is synonymous with manifest, obvious, and apparent. Webster’s Ninth New Collegiate Dictionary 430 (1985). The statutory language, with which we always begin, seems to require upholding arbitral awards unless bias was clearly evident in the decision-makers.
The panel decision here disagreed with the straightforward interpretation, however, and concluded that, in “a nondisclosure case in which the parties chose the arbitrator,” the “arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable impression of the arbitrator’s partiality.” 436 F.3d at 502. The panel acknowledged a lack of any actual bias in this award even as it substituted a reasonable impression of partiality standard for “evident” partiality in eases of an arbitrator’s nondisclosure to the parties. The panel believed this different standard to be required by the Supreme Court’s decision in Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), which interpreted § 10(b).[2]
How Commonwealth Coatings guides this court is a critical issue. Reasonable minds can agree that Commonwealth Coatings, like many plurality-plus Supreme Court decisions, is not pellucid. Justice Black delivered the opinion of the Court and imposed “the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.” Id. at 149, 89 S.Ct. at 339. He noted that, while arbitrators are not expected to sever all ties with the business world, courts must be scrupulous in safeguarding the impartiality of arbitrators, who are given the ability to decide both the facts and the law and whose decisions are not subject to appellate review. Id. at 148-49, 89 S.Ct. at 339. Thus, arbitrators “not only must be unbiased but also must avoid even the appearance of bias,” Id. at 150, 89 S.Ct. at 340, in order to maintain confidence in the arbitration system.
Justice White, the fifth vote in the case, together with Justice Marshall, purported to be “glad to join” Justice Black’s opinion, but he wrote to make “additional remarks.” Id. (White, J., concurring). Justice White emphasized that “[t]he Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges.” Id. Indeed, Justice White wrote that arbitrators are not “automatically disqualified by a business relationship with the parties before them if ... [the parties] are unaware of the facts but the relationship is trivial.” Id. While supporting a policy of disclosure by arbitrators to enhance the selection process, Justice White also concluded, in a practical vein, that an arbitrator “cannot be expected to provide the parties with his complete and unexpurgated business biography.” Id. at 151, 89 S.Ct. at 340. His opinion fully envisions upholding awards when ar *282 bitrators fail to disclose insubstantial relationships. Id. at 152, 89 S.Ct. at 341.
If one lays primary emphasis on Justice White’s statement that he was “glad to join” the plurality, his opinion can be deemed reconcilable with that of Justice Black. Only in that event is the plurality opinion binding on lower courts.
Another compelling reading of the opinions is also possible, however. Justice Black’s opinion uses an egregious set of facts as the vehicle to require broad disclosure of “any dealings that might create an impression of possible bias.” Id. at 149, 89 S.Ct. at 339. Justice White, for his part, hews closely to the facts and finds it “enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed.” 393 U.S. at 151-52, 89 S.Ct. at 34-41 (emphasis added). Justice White, thus read, supports ample but not unrealistic disclosure, and he supports a cautious approach to vacatur for nondisclosure. His “joinder” is magnanimous but significantly qualified.
The latter reading is more persuasive, because it accords scope to the full White opinion, unlike the view that focuses on the introductory “glad to join” sentence. Thus, Justice White’s concurrence, pivotal to the judgment, is based on a narrower ground than Justice Black’s opinion, and it becomes the Court’s effective ratio deci-dendi. See Marks v. United States, 430 U.S. 188, 193-94, 97 S.Ct. 990, 993-94, 51 L.Ed.2d 260 (1977).
A majority of circuit courts have concluded that Justice White’s opinion did not lend majority status to the plurality opinion. See Nationwide Mut. Ins. Co. v. Home Ins. Co., 429 F.3d 640, 644 n. 5 (6th Cir.2005) (“[A] majority of the Court did not endorse the ‘appearance of bias’ standard set forth in the plurality opinion”); ANR Coal Co., Inc. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499-500 & n. 3 (4th Cir.1999) (noting that courts have given Justice White’s “concurrence particular weight” and holding that “an arbitrator’s failure to reveal facts may be relevant in determining evident partiality under 9 U.S.C. § 10(a)(2), but that mere nondisclosure does not in itself justify vacatur”); Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 83 n. 3 (2d Cir.1984) (“Because the two opinions are impossible to reconcile, however, we must narrow the holding to that subscribed to by both Justices White and Black”); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681 (7th Cir.1983) (noting that Commonwealth Coatings “provides little guidance because of the inability of a majority of Justices to agree on anything but the result”); cf. Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc., 304 F.3d 1331, 1339-40 (11th Cir.2002) (citing Justice White’s Commonwealth Coatings opinion and permitting vacatur only if facts creating “a reasonable impression of partiality” are not disclosed); Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 146 (4th Cir.1993) (“It is well established that a mere appearance of bias is insufficient to demonstrate evident partiality. Arbitrators are not held to the same ethical standards required of Article III judges .... ” (citations omitted)); Ormsbee Dev. Co. v. Grace, 668 F.2d 1140, 1147, 1150-51 (10th Cir.1982) (citing Justice White’s Commonwealth Coatings opinion and requiring “clear evidence of impropriety” for vacatur). While these courts’ interpretations of Commonwealth Coatings may differ in particulars, they all agree that nondisclosure alone does not require vacatur of an arbitral award for evident partiality. An arbitrator’s failure to dis *283 close must involve a significant compromising connection to the parties.
This court’s prior easelaw is also consistent with a narrow reading of Commonwealth Coatings. In Bernstein Seawell & Kove v. Bosarge, 813 F.2d 726 (5th Cir.1987), the losing party in the arbitration challenged the award because of the alleged evident partiality of one of the arbitrators. The arbitrator owned a fractional share of the disputed property and had received commissions on the sale of certain interests. The court held the party had waived his objection to the composition of the panel. Nevertheless, “[e]ven assuming no waiver,” he had not produced evidence of evident partiality,[3] because “[t]he appearance of impropriety, standing alone, is insufficient.” Id. at 732 (quoting Sheet Metal Workers Int’l Ass’n Local Union 120 v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir.1985)). The court also noted that “[ejvident partiality means more than a mere appearance of bias.” Id. (quoting Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173 (2d Cir.1984)).
Only the Ninth Circuit has interpreted Commonivealth Coatings, as the panel majority did, to de-emphasize Justice White’s narrowing language. See Schmitz v. Zilveti, 20 F.3d 1043 (9th Cir.1994). In Schmitz, the court criticized case law suggesting “that an impression of bias is sufficient while an appearance [of bias] is not.” Id. at 1047. Commonwealth Coatings, it held, does not merit such a “hairline distinction.” Id. Schmitz not only interpreted Commonwealth Coatings to mandate a “reasonable impression of bias” standard in nondisclosure cases but went on to vacate an arbitral award where the arbitrator had not himself been aware of the potential conflict and had failed to undertake due diligence to ascertain and then disclose it to the parties.[4] Even if one ignores the extension of Commonwealth Coatings by Schmitz, the undisclosed relationship between the arbitrator’s firm and Pru-Bache’s parent company was more current, concrete and financially meaningful than the co-counsel relationship in the present case. Schmitz is an outlier that lends little support to Positive Software.
As we have concluded, the better interpretation of Commonwealth Coatings is that which reads Justice White’s opinion holistically. The resulting standard is that in nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding. The “reasonable impression of bias” standard is thus interpreted practically rather than with utmost rigor.
According to this interpretation of Commomuealth Coatings, the outcome of this case is clear: Shurn’s failure to disclose a trivial former business relationship does not require vacatur of the award. The essential charge of bias is that the arbitrator, Peter Shurn, worked on the same litigation as did Ophelia Camina, counsel for one of the parties. They represented Intel in protracted patent litiga *284 tion that lasted from 1990 to 1996. Cami-ña and Shurn each signed the same ten pleadings, but they never met or spoke to each other before the arbitration. They were two. of thirty-four lawyers, and from two of seven firms, that represented Intel during the lawsuit, which ended at least seven years before the instant arbitration.
No case we have discovered in research or briefs has come close to vacating an arbitration award for nondisclosure of such a slender connection between the arbitrator and a party’s counsel. In fact, courts have refused vacatur where the undisclosed connections are much stronger. See, e.g., Montez v. Prudential Sec., Inc., 260 F.3d 980, 982, 984 (8th Cir.2001) (no vacatur; as general counsel for a company, arbitrator had employed sixty-eight attorneys, paying them $2.8 million in fees, from the law firm representing one of the parties in the arbitration); ANR Coal, 173 F.3d at 495-96 (no vacatur; arbitrator’s law firm represented company that indirectly caused the dispute in the arbitration by buying less from the defendant, who in turn sought to buy less from the plaintiff); Al-Harbi v. Citibank, N.A., 85 F.3d 680, 682 (D.C.Cir.1996) (no vacatur where arbitrator’s former law firm represented party to the arbitration on unrelated matters); Lifecare Int’l, Inc. v. CD Med., Inc., 68 F.3d 429, 432-34 & n. 3 (11th Cir.1995) (no vacatur where arbitrator had memorialized prior scheduling dispute with an attorney from the law firm representing one of the parties and mentioned it eighteen months later at the arbitration; arbitrator also failed to disclose that he became “of counsel” to a law firm the prevailing party had interviewed for the purpose of obtaining representation in the instant dispute and that had reviewed the contract involved in the case two years prior; court found this, at best, showed a “remote, uncertain, and speculative partiality”); Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1255, 1264 (7th Cir.1992) (arbitrator knew one of the parties, had worked in the same office with him twenty years ago, and saw him about once a year since; the court found this relationship “minimal” and insufficient to vacate); Merit Ins., 714 F.2d at 677, 680 (no vacatur; arbitrator had worked directly under the president and principal stockholder of one of the parties for three years, ending fourteen years pri- or to the arbitration; the Seventh Circuit noted that “[t]ime cools emotions, whether of gratitude or resentment”); Ormsbee Dev. Co., 668 F.2d at 1149-50 (no vacatur where arbitrator and law firm representing a party had clients in common; requiring vacatur under such facts would “request that potential neutral arbitrators sever all their ties with the business world” (internal quotation omitted)).
The relationship in this case pales in comparison to those in which courts have granted vacatur. See, e.g., Commonwealth Coatings, 393 U.S. at 146, 89 S.Ct. at 338 (business relationship between arbitrator and party was “repeated and significant”; the party to the arbitration was one of the arbitrator’s “regular customers”; “the relationship even went so far as to include the rendering of services on the very projects involved in this lawsuit”); Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir.1995) (arbitrator was a high-ranking officer in a company that had a substantial ongoing business relationship with one of the parties); Schmitz, 20 F.3d at 1044 (arbitrator’s law firm represented parent company of a party for decades, including within two years of the arbitration); Morelite, 748 F.2d at 81 (arbitrator’s father was General President of the union involved in the arbitrated dispute).
Finally, even if Justice White’s “joinder” is not read as a limitation on *285 Justice Black’s opinion in Commonwealth Coatings, and the controlling opinion emphatically requires arbitrators to “disclose to the parties any dealings that might create an impression of possible bias,” 393 U.S. at 149, 89 S.Ct. at 339, we cannot find the standard breached in this case. The facts of Commonwealth Coatings are easily distinguishable. In Commonwealth Coatings, the arbitrator and a party had a “repeated and significant” business relationship. Id. at 146, 89 S.Ct. at 338. The relationship involved fees of about $12,000 paid to the arbitrator by the party, extended over a period of four or five years, ended only one year before the arbitration, and even included the rendering of services on the very projects involved in the arbitration before him. Id. Such a relationship bears little resemblance to the tangential, limited, and stale contacts between Shurn and Camifia. Nothing in Commonwealth Coatings requires vacatur for the undisclosed relationship in this case.
CONCLUSION
Awarding vacatur in situations such as this would seriously jeopardize the finality of arbitration. Just as happened here, losing parties would have an incentive to conduct intensive, after-the-fact investigations to discover the most trivial of relationships, most of which they likely would not have objected to if disclosure had been made. Expensive satellite litigation over nondisclosure of an arbitrator’s “complete and unexpurgated business biography” will proliferate. Ironically, the “mere appearance” standard would make it easier for a losing party to challenge an arbitration award for nondisclosure than for actual bias.
Moreover, requiring vacatur based on a mere appearance of bias for nondisclosure would hold arbitrators to a higher ethical standard than federal Article III judges. In his concurrence, Justice White noted that the Court did not decide whether “arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges.” Id. at 150, 89 S.Ct. at 340 (White, J., concurring). This cannot mean that arbitrators are held to a higher standard than Article III judges. Had this same relationship occurred between an Article III judge and the same lawyer, neither disclosure nor disqualification would have been forced or even suggested. See Chitimacha Tribe of La. v. Harry L. Laws Co., 690 F.2d 1157, 1166 (5th Cir.1982) (rejecting a finding of judicial bias where the federal judge had represented a party to the case in an unrelated matter at least six years prior). WThile it is true that disclosure of prior significant contacts and business dealings between a prospective arbitrator and the parties furthers informed selection,[5] it is not true, as Justice White’s opinion perceptively explains, that “the best informed and most capable potential arbitrators” should be automatically disqualified (and their awards nullified) by failure to inform the parties of trivial relationships. Commonwealth Coatings, 393 U.S. at 150, 89 S.Ct. at 340.
Finally, requiring vacatur - on these attenuated facts would rob arbitration of one of its most attractive features apart from speed and finality — expertise. Arbitration *286 would lose the benefit of specialized knowledge, because the best lawyers and professionals, who normally have the longest lists of potential connections to disclose, have no need to risk blemishes on their reputations from post-arbitration lawsuits attacking them as biased.
Neither the FAA nor the Supreme Court, nor predominant case law, nor sound policy countenances vacatur of FAA arbitral awards for nondisclosure by an arbitrator unless it creates a concrete, not speculative impression of bias. Arbitration may have flaws, but this is not one of them. The draconian remedy of vacatur is only warranted upon nondisclosure that involves a significant compromising relationship. This case does not come close to meeting this standard.
The judgment of the district court is REVERSED, and the case is REMANDED FOR FURTHER PROCEEDINGS.

. 9 U.S.C. § 10(a)(2) ("[T]he United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration ... where there was evident partiality or corruption in the arbitrators ....")■

. What was then § 10(b) is now contained in § 10(a)(2).

. The discussion surrounding the court’s finding of no evidence of evident partiality is an alternative holding, not dicta, and accordingly, its discussion of evident partiality is binding precedent on any subsequent panels.

. In Schmitz, the arbitrator's law firm previously had represented Prudential Insurance Co., the parent of Pru-Bache Securities, the prevailing party in the arbitration. The representation involved at least nineteen cases over a thirty-five year period, including a case that ended less than two years before the arbitration. The arbitrator had reviewed documents naming the parent company, but did not run a conflict check for the parent or disclose any of his firm's earlier representations of the parent company prior to the arbitration.

. The American Arbitration Association (“AAA”), whose rules governed this proceeding, requires broad prophylactic disclosure of "any circumstance likely to affect impartiality or create an appearance of partiality,” so that parties may rely on the integrity of the selection process for arbitrators. Whether Shurn’s nondisclosure ran afoul of the AAA rules, however, is not before us and plays no role in applying the federal standard embodied in the FAA.