194 P.3d 1181

**William KAY, Jr., Individually and as Special Administrator of the Estate of Jeffrey Kay, Petitioner–Appellant,**

v.

**KAISER FOUNDATION HEALTH PLAN, INC., Respondent–Appellee.**

**No. 27581.**

Intermediate Court of Appeals of Hawaiʻi.

Oct. 31, 2008.

award. Therefore, we reverse the Confirmation Order.

## I. RELEVANT FACTS

### A. Procedural History

In August of 2000, Jeffrey brought a medical malpractice claim against Kaiser for failing to diagnose a brain tumor, by submitting his claim to the Medical Claim Conciliation Panel (**MCCP**).[2] On December 11, 2000, the MCCP found that Kaiser was actionably negligent in the care and treatment of Jeffrey.

On January 16, 2001, Jeffrey demanded arbitration pursuant to Kaiser's service agreement. Kaiser's service agreement mandated a three-member arbitration panel, and at least one arbitrator had to be a physician. After receiving curriculum vitae (**C.V.**) of potential arbitrators from Dispute Prevention & Resolution, Inc. (**DPR**), on February 21, 2001, the parties jointly selected three arbitrators for the arbitration panel: James E. Duffy, Esq. (**Duffy**), Thomas Kaulukukui, Jr., Esq. (**Kaulukukui**), and Dr. Tom, the panel's only physician.

Arbitration hearings were held on August 7, 2001, and March 19, 20, 21, 22, and 23, 2002. Oral closing arguments were presented on March 26, 2002, and written closing arguments were filed on April 5, 2002. On May 28, 2002, the arbitrators issued their final order. The majority found that although Kaiser was negligent, its negligence was not a cause of Jeffrey's injuries. Specifically, the majority concluded: (1) Jeffrey's tumor had crossed the corpus callosum in February 1998, at the time he first presented to Kaiser with symptoms; (2) surgical resection of a tumor in the corpus callosum is not a viable treatment option; and (3) Jeffrey's treatment was therefore not adversely affected by the 10–month delay in diagnosis by Kaiser of Jeffrey's brain tumor. Kaulukukui dissented, finding, inter alia: (1) Jeffrey's tumor had not crossed the corpus callosum as of February 1998; (2) conflicts between credible expert testimony should be resolved

Richard Turbin, Rai Saint Chu, Sidney D. Smith, Jr. (Law Offices of Richard Turbin), Honolulu, on the briefs, for Petitioner–Appellant.

George W. Playdon, Jr., Kelvin H. Kaneshiro (Reinwald O'Connor & Playdon LLP), Honolulu, on the briefs, for Respondent–Appellee.

FOLEY, Presiding Judge, FUJISE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

Plaintiff–Appellant William Kay, Jr. (**Kay**), father of Jeffrey Kay (**Jeffrey**), challenges an arbitration award issued on May 28, 2002, which was confirmed by the Circuit Court of the First Circuit (**Circuit Court**) in its Findings of Fact, Conclusions of Law and Order (**Confirmation Order**), filed on October 21, 2005.[1] Kay argues that: (1) certain of the Circuit Court's Findings of Fact (**FOFs**) are inaccurate and/or incomplete; (2) several of the Circuit Court's Conclusions of Law (**COLs**) are wrong; and (3) the Circuit Court erred in denying his motion to vacate the arbitration award because one of the arbitrators, Laurie Tom, M.D. (**Dr. Tom**), failed to disclose that she had a prior relationship with the opposing party in arbitration, Kaiser Foundation Health Plan, Inc. (**Kaiser**), whereby she solicited contributions from Kaiser for a charitable organization with which she was affiliated, including during the pendency of the arbitration.

For the reasons set forth below, we hold that: (1) an arbitrator's failure to disclose her direct, personal involvement in ongoing, fund-raising solicitations to one of the parties, while the arbitration is pending, creates an impression of partiality or possible bias; and (2) the Circuit Court erred in denying Kay's petition to vacate the arbitration award

---

1. The Honorable Karen S.S. Ahn presided.

2. Hawaii Revised Statutes (**HRS**) § 671–12 (1993) requires any person claiming that a medi-

cal tort has been committed to submit the claim to the MCCP before a suit based on the claim may be commenced in any court in Hawai'i.

in favor of plaintiff; (3) but for Kaiser's negligence, Jeffrey probably would have had a better outcome as a result of earlier treatment; and (4) Kaiser's negligence caused Jeffrey to suffer serious and substantial injury.

On June 7, 2002, Jeffrey filed a Petition to Vacate Arbitration Award Dated May 28, 2002, Or In the Alternative For a Stay of Confirmation of Award Pending Discovery of Further Evidence of Evident Partiality, pursuant to Hawaii Revised Statutes (**HRS**) § 658-9 (1993), alleging evident partiality on behalf of Dr. Tom.[3] Jeffrey alleged that Dr. Tom, as an active and high-ranking member and fundraiser for the American Diabetes Association (**ADA**), had "an undisclosed, longstanding, personal, professional, and business relationship" with Kaiser, which had contributed large sums of money to ADA, presided over by Dr. Tom. According to Jeffrey, Dr. Tom also failed to disclose that she was a student of Kaiser's chief expert witness, John Hardman, M.D. (**Dr. Hardman**), while in medical school.

In response, and in a Cross–Petition to Confirm Award, Kaiser argued, inter alia, that confirmation of the award was proper and there was no evident partiality by virtue of Dr. Tom's role with ADA, because ADA is a national organization and there is no evidence that Kaiser's national contributions benefitted Dr. Tom or ADA's Hawai'i office.

Jeffrey died from his brain tumor on December 30, 2002 and his death was suggested upon the record on January 30, 2003. As Special Administrator of Jeffrey's estate, Kay was substituted for Jeffrey in this case on March 24, 2003.

After further briefing by both parties,[4] on April 11, 2005, evidentiary hearings began on the cross-petitions. The Circuit Court heard

testimony from Kay and arbitration experts Spalding and Donahey. On September 13, 2005, the second day of the evidentiary hearings, the court also heard the testimony of Kevin Imanaka (**Imanaka**), Kaiser's Communications and Community Relations Manager until 2003, and Scott Nariyoshi (**Nariyoshi**), Kaiser's Director of Community Relations and Communications until 2003.

At the conclusion of the hearings, the Circuit Court ruled in favor of Kaiser and against Kay. The Confirmation Order granted Kaiser's cross-petition to confirm the arbitration award and dismissed Kay's petition to vacate the award with prejudice. Kay filed a timely notice of appeal on November 3, 2005.

### B. Dr. Tom's Relationship and Contacts with Kaiser

The undisclosed relationship underlying the claim of evident partiality in this case stems from Dr. Tom's extensive involvement with ADA and, in her various roles with ADA, Dr. Tom's fundraising and other involvement with Kaiser.

Regarding her relationship with ADA, Dr. Tom's C.V. noted only that she had been the President of the Hawai'i branch of ADA from 1995 to 1997. In a declaration submitted to the Circuit Court in 2005, Dr. Tom also reported that:

- Dr. Tom was the regional President of ADA's Pacific Northwest Region from 1999–2002.

- Dr. Tom served as a council member of ADA's Hawai'i affiliate in 2000–2002.

- Dr. Tom became a board member of national ADA in 2003.[5]

Scott Donahey (**Donahey**), confirms that the relationships at issue in the case do not amount to "evident partiality." Also on February 15, 2004, Kay filed a brief arguing, inter alia, that Dr. Tom's failure to disclose her contacts with Kaiser created an impression of possible bias.

---

**3.** Initially, Kay also alleged evident partiality on behalf of Duffy. That allegation, however, was abandoned and is not an issue in this appeal.

**4.** On February 15, 2004, Kaiser filed a brief in support of its position, arguing that: (1) Kay has not met his burden of showing actual bias or a failure to disclose for his evident partiality claim; (2) Kay's arbitration expert, Francis O. Spalding (**Spalding**), is not a neutral evaluator because he has testified against Kaiser in the past; and (3) the opinion of Kaiser's arbitration expert, M.

**5.** Although her board membership with ADA national post-dated the arbitration, Dr. Tom was nominated to this position in February of 2002, while the arbitration was pending.

- Dr. Tom was a member of ADA's Community & Voluntary Development Committee in 2000–2002.
- In 2002, Dr. Tom received ADA's Outstanding Community Service in Raising Funds Award for the Pacific Northwest Region.
- As Regional President (1999–2002), Dr. Tom's duties included serving as a liaison to medical groups in the region.
- In 2002, Dr. Tom was under a "voluntary commitment" to raise funds for ADA.

In deposition, Dr. Tom's testimony included that:

- One of the major purposes and functions of ADA was to raise funds and that ADA Hawai'i was dependent on corporate donations.
- When Dr. Tom was President of ADA Hawai'i, she assumed a "substantial role" as a fundraiser. She continued her involvement in fundraising when she served as regional President.
- Dr. Tom recalled soliciting Kaiser for more than one fundraising event, through "form" letters that she signed.
- In 2001, Dr. Tom informed the program coordinator for the Taking Control of Your Diabetes Program (**TCOYD**) that she had "connections" at Kaiser that could disseminate program information and invitations. (A December 2001 TCOYD Status Report also noted Dr. Tom's connections at "the predominant HMO in Hawaii.")

The fundraising letters signed by Dr. Tom included a February 28, 2002 letter addressed to Kaiser's Community Relations Manager, Imanaka. Imanaka testified that Kaiser was an active supporter involved with ADA Hawai'i in 2001 and 2002, as well as a regular contributor to the organization. He explained that Kaiser regularly contributed to many nonprofit organizations in the community. He had received both solicitation letters and thank you letters signed by Dr. Tom on behalf of ADA. Kaiser employee Nariyoshi also testified that he received solicitation letters and one handwritten note from Dr. Tom regarding participation in ADA fundraisers. The record includes contributions from Kaiser to ADA Hawai'i between 1997 and 2003 in various amounts up to $2,500, including a May 2002 contribution in the amount of $450 for an "ADA tournament," which appears to be in response to the February 2002 solicitation letter signed by Dr. Tom. Through ADA and in conjunction with a 2002 TCOYD conference and other diabetes-related programs, Dr. Tom had various other interactions with Kaiser doctors and personnel in conjunction with diabetes-related programs.

There is no evidence in the record that Dr. Tom made *any* disclosure of her dealings with Kaiser in conjunction with her work with ADA. There is no question that Dr. Tom had actual knowledge of her fundraising and other activities involving Kaiser. Kaiser relies on the undisputed fact that Dr. Tom acted not in a personal capacity, but in conjunction with her role at ADA, and the assertion that Dr. Tom did not benefit from the fundraising and other activities involving Kaiser.

With respect to Dr. Tom's non-disclosure of her interactions with Kaiser, the Circuit Court recognized that the facts were undisclosed, but concluded:

5. The Court finds and concludes that, based on the credible evidence, [Kay] has failed to sustain his burden of proving, by a preponderance of the evidence, that the undisclosed facts show "a reasonable impression of partiality." The Court further finds and concludes that [Kay] has failed to sustain his burden of proving, by a preponderance of the evidence, a personal, social, professional or financial relationship between Dr. Tom and [Kaiser] so intimate as to cast serious doubt on Dr. Tom's impartiality. The Court therefore finds and concludes that there was no evident partiality on the part of Dr. Tom.

## II. *ISSUES ON APPEAL*

On appeal, Kay argues: (1) various of the Circuit Court's FOFs (9 and 13–20) are inaccurate and/or incomplete, and thus clearly erroneous; (2) several COLs (2–7 and 9) are wrong; and (3) the arbitration award was

tainted by evident partiality arising from Dr. Tom's undisclosed relationship and contacts with Kaiser and therefore should be vacated.

## III. STANDARDS OF REVIEW

 "We review the circuit court's ruling on an arbitration award *de novo*, but we also are mindful that the circuit court's review of arbitral awards must be extremely narrow and exceedingly deferential." *Tatibouet v. Ellsworth*, 99 Hawai'i 226, 233, 54 P.3d 397, 404 (2002) (citations, internal quotation marks, and brackets omitted).

Judicial review of an arbitration award is limited by the following precepts:

First, because of the legislative policy to encourage arbitration and thereby discourage litigation, arbitrators have broad discretion in resolving the dispute. Upon submission of an issue, the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts. In fact, where the parties agree to arbitrate, they thereby assume all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact.

Second, correlatively, judicial review of an arbitration award is confined to the strictest possible limits. An arbitration award may be vacated only on the four grounds specified in HRS § 658-9 and modified and corrected only on the three grounds specified in HRS § 658-10. Moreover, the courts have no business weighing the merits of the award.

Third, HRS §§ 658-9 and -10 also restrict the authority of appellate courts to review judgments entered by circuit courts confirming or vacating the arbitration awards.

*Daiichi Hawai'i Real Estate Corp. v. Lichter*, 103 Hawai'i 325, 336, 82 P.3d 411, 422 (2003) (internal quotation marks, brackets, ellipses points, and citations omitted).

*Schmidt v. Pac. Benefit Servs., Inc.*, 113 Hawai'i 161, 165–66, 150 P.3d 810, 814–15 (2006).

In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court, in reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Haw.*, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (citations, internal quotation marks, and brackets omitted).

A COL is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Chun*, 106 Hawai'i at 430, 106 P.3d at 353 (citations, internal quotation marks, and brackets omitted) (quoting *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

## IV. DISCUSSION

### A. The Challenged FOFs

Without exception, Kay argues that the FOFs are clearly erroneous based on what was *excluded* from the FOFs, rather than what was included. Kay argues that the Circuit Court, in entering the FOFs, ignored substantial evidence that supports mixed questions of fact and law and additional findings that: (1) Dr. Tom failed to disclose significant facts that would lead a reasonable person to question her partiality; (2) Dr.

Tom's involvement with ADA and solicitation of Kaiser was not *merely* titular, although she held various titled offices; (3) Dr. Tom was an active leader of the ADA who repeatedly solicited contributions from Kaiser, a regular contributor to ADA, including while the arbitration was pending; (4) during Dr. Tom's active involvement with ADA, there was collaboration between ADA and Kaiser in diabetes-related programs; and (5) Dr. Tom knew and was known to various Kaiser personnel through her activities with ADA. In other words, the FOFs downplay Dr. Tom's ADA role and contacts with Kaiser, disregarding the substantial evidence of Dr. Tom's active and long-standing involvement with Kaiser.

Although Kay's assertions are supported by the record in this case, under the applicable standard of review, we conclude that the Circuit Court did not clearly err in entering the specific FOFs challenged by Kay on this appeal. Nevertheless, in conjunction with our review of the Circuit Court's conclusion that there was no evident partiality on the part of Dr. Tom, we will consider Kay's argument that substantial evidence exists in the record to support a conclusion of evident partiality sufficient to vacate the arbitration award.

## B. *The Evident Partiality Standard*

The arbitration award in this case can be vacated only on one of the four grounds specified in HRS § 658–9. *Strickland v. Seiple*, 5 Haw.App. 168, 170, 680 P.2d 533, 535 (1984). HRS § 658–9 (1993) provides in part:

**Vacating award.** In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration:

(1) Where the award was procured by corruption, fraud, or undue means;

(2) *Where there was evident partiality or corruption in the arbitrators, or any of them;*

(3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.

Where an award is vacated and the time, within which the agreement required the award to be made, has not expired, the court may in its discretion direct a rehearing by the arbitrators.

(Emphasis added.)

Although HRS chapter 658, entitled "Arbitration and Awards," was repealed in 2001 and replaced with the Uniform Arbitration Act, codified in HRS chapter 658A, it is applicable to the instant case because, as a member of Kaiser's health plan, Jeffrey agreed to Kaiser's arbitration provision in 1998. *See* HRS § 658A–3 (Supp.2001) ("this chapter governs an agreement to arbitrate made on or after July 1, 2002"). The evident partiality standard continues in effect under HRS chapter 658A.[6]

---

6. Section 658A–12 (Supp.2007) provides in part:
 **Disclosure by arbitrator.** (a) Before accepting appointment, an individual who is requested to serve as an arbitrator, after making reasonable inquiry, shall disclose to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators *any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding,* including:
 (1) A financial or personal interest in the outcome of the arbitration proceeding; and
 (2) *An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or*

representatives, a witness, or another arbitrator.

....

(d) If the arbitrator did not disclose a fact as required by subsection (a) or (b), upon timely objection by a party, the court under 658A–23(a)(2) may vacate an award.

(e) *An arbitrator appointed as a neutral arbitrator who does not disclose a known, direct, and material interest in the outcome of the arbitration proceeding or a known, existing, and substantial relationship with a party is presumed to act with evident partiality under section 658A–23(a)(2).*

(Emphases added.)

Section 658A–23 (Supp.2007) provides in part:

Hawai'i's appellate courts have previously recognized that "[w]hat constitutes 'evident partiality' sufficient to vacate an arbitration award [under HRS § 658-9] is a difficult question." *Daiichi Hawai'i Real Estate Corp. v. Lichter*, 103 Hawai'i 325, 339, 82 P.3d 411, 425 (2003) (citation omitted); *see also Salud v. Fin. Sec. Ins. Co., Ltd.*, 7 Haw.App. 329, 334, 763 P.2d 9, 11 (1988). As the legislative history of HRS § 658-9 fails to provide any insight into the meaning of "evident partiality," we have often turned to federal case law for guidance. *See Brennan v. Stewarts' Pharmacies, Ltd.*, 59 Haw. 207, 223 n. 11, 579 P.2d 673, 682 n. 11 (1978) (re legislative history); *see also, e.g., Daiichi Hawai'i*, 103 Hawai'i at 339-41, 82 P.3d at 425-27 (favorably citing, inter alia, *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968); *Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir.1994); *Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419, 423-24 (2d Cir.1986); *HSMV Corp. v. ADI Ltd.*, 72 F.Supp.2d 1122, 1130 (C.D.Cal.1999); and *Valrose Maui, Inc. v. Maclyn Morris, Inc.*, 105 F.Supp.2d 1118, 1124 (D.Haw.2000); *Sousaris v. Miller*, 92 Hawai'i 534, 542, 993 P.2d 568, 576 (App.1998) (quoting *Schmitz*, 20 F.3d at 1046)).

■ It is clear that evident partiality may be demonstrated when a conflict of interest exists with the arbitrator; i.e., where the arbitrator "has a personal, professional, or business relationship with a party, its counsel, principal, or agent, a conflict of interest may arise sufficient to justify vacating that arbitration award." *Daiichi Hawai'i*, 103 Hawai'i at 339-40, 82 P.3d at 425-26 (citation omitted). That said, "not all dealings rise to the level of creating the impression—or reality—of possible bias so as to warrant vacating an arbitration award based on evident partiality." *Id.* at 341, 82 P.3d at 427-28 (citations and internal quotation marks omitted). "[T]he mere fact of a *prior* relationship is not in and of itself sufficient to disqualify arbitrators. The relationship between the arbitrator and the party's principal must be so intimate—personally, socially, professionally, or financially—as to cast serious doubt on the arbitrator's impartiality." *Id.* at 342, 82 P.3d at 428 (emphasis added, citations omitted).

■ However, Hawai'i courts also have explained that evident partiality is distinct from actual bias. Evident partiality not only exists when there is actual bias on the part of the arbitrator, but also "when undisclosed facts show a reasonable impression of partiality." *Sousaris*, 92 Hawai'i at 542, 993 P.2d at 576 (citation omitted); *Daiichi Hawai'i*, 103 Hawai'i at 340, 82 P.3d at 426; *see also Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir.1996) ("In nondisclosure cases, vacatur is appropriate where the arbitrator's failure to disclose information gives the impression of bias in favor of one party.").

In its seminal case on evident partiality, *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the United States Supreme Court held that a party seeking to vacate an arbitration award for evident partiality need not show that the arbitrator "was actually guilty of fraud or bias in deciding th[e] case." *Id.* at 147-48, 89 S.Ct. 337. Rather, the arbitrator's failure to disclose to the parties any dealings that might create "an impression of possible bias" is sufficient to support vacatur. *Id.* at 149, 89 S.Ct. 337. The Court noted that it was especially important for arbitrators to disclose any dealings that might create an impression of possible bias:

It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, *but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitra-*

Vacating award. (a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

. . . .

(2) There was:

(A) Evident partiality by an arbitrator appointed as a neutral arbitrator[.]

tion process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.

*Id.* at 148–49, 89 S.Ct. 337 (emphasis added).

In a concurring opinion, Justice White also stated:

In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise. And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

*Id.* at 151, 89 S.Ct. 337 (White, J., concurring) (footnote omitted).

The Ninth Circuit Court of Appeals and United States District Court for the District of Hawai'i, following *Commonwealth Coatings*, have generally employed a relatively broad interpretation of a "reasonable impression of partiality." In *Schmitz v. Zilveti*, 20 F.3d 1043 (9th Cir.1994), the Ninth Circuit vacated an arbitration award for evident partiality where one arbitrator's law firm had represented the parent company of a party in arbitration in at least nineteen cases during a 35–year period, and the most recent representation ended approximately 21 months before arbitration. *Id.* at 1044. Despite the fact that the arbitrator had *no actual knowledge* of his law firm's conflict, the Ninth Circuit held that there was a "reasonable impression of partiality" and the arbitrator had a duty to investigate independent of his duty to disclose. *Id.* at 1048–49. In declin-

ing to adopt "a per se rule that no reasonable impression of partiality can be found absent a showing that the arbitrator knew the facts on which it is based," the court reasoned that "[i]f the parties are to be judges of the arbitrators' partiality, duties to investigate and disclose conflicts must be enforced, even if later a court finds that no actual bias was present." *Id.* at 1049. The court further stated: "parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed." *Id.* at 1047.

In *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101 (9th Cir. 2007), the Ninth Circuit Court of Appeals also vacated an arbitration award based on evident partiality where an arbitrator failed to disclose that, during the arbitration, he began work as a senior executive with a production company that was negotiating with an executive of one of the parties to the arbitration to finance and co-produce a motion picture, and subsequently entered an arbitration award in favor of that party. *Id.* at 1103. Despite a lack of evidence that the arbitrator had actual knowledge of the facts he failed to disclose, the court found the arbitrator had a duty to investigate potential conflicts when he accepted a position with the production company, and the arbitrator had a substantial interest in the company, which was doing "more than trivial business" with a party in arbitration. *Id.* at 1108–09. The court reasoned that the business between the companies was not trivial because negotiations were not distant in time and had been *ongoing during the arbitration. Id.* at 1110.

Similarly, in *Valrose Maui, Inc. v. Maclyn Morris, Inc.*, 105 F.Supp.2d 1118 (D.Haw. 2000), the court found there was a reasonable impression of partiality where an arbitrator failed to disclose an ex parte communication with one of the parties' attorneys—while the arbitration was pending—regarding the possibility of serving as a mediator in an unrelated medical malpractice action. *Id.* at 1123–24. The court noted that "[a]lthough the Arbitrator may have merely overlooked disclosing his conversation and appointment as mediator in the malpractice action, the present case presents a more egregious situation than was involved in *Schmitz* ... the

Arbitrator had actual knowledge of the conflict[.]" *Id.* at 1124.

Kaiser relies heavily on the Hawai'i Supreme Court's decision in *Daiichi Hawai'i* to support its arguments that no disclosure was required by Dr. Tom, Kay failed to satisfy the standard for evident partiality because Dr. Tom's involvement with Kaiser was only through ADA, and Dr. Tom did not benefit personally, socially, professionally, or financially from that involvement. Thus, further examination of *Daiichi Hawai'i* is instructive.[7]

The *Daiichi Hawai'i* case arose out of a commercial lease rent arbitration proceeding. 103 Hawai'i at 328, 82 P.3d at 414. Under the operative arbitration clause, each party selected a "party-appointed arbitrator" and then those two arbitrators appointed a third, "neutral" arbitrator. *Id.* Importantly, each of the three arbitrators in *Daiichi Hawai'i* made disclosures of their prior dealings with the parties, the lawyers representing the parties, or both. *Id.* at 329, 82 P.3d at 415. The lessors appointed their former lawyer, William Swope (**Swope**), who disclosed the former representation, but failed to mention that he had represented the lessors against the lessee on matters which were the subject of the arbitration proceeding between the parties.[8] *Id.* at 328–31, 82 P.3d at 414–17. Although the lessee's lease files contained a copy of a key letter from Swope to the lessee on these issues (and at least one other letter from Swope), lessee failed to make inquiries or raise objections based on Swope's disclosures or to review its own files until after the arbitration. *Id.* at 331–34, 82 P.3d at 417–20.

The supreme court held that the lessee in *Daiichi Hawai'i* had both actual and constructive knowledge of Swope's prior attorney-client relationship with the lessors and, thus, having failed to object to Swope's appointment, the lessee *waived* its right to challenge the arbitration decision based on the alleged evident partiality. *Id.* at 339, 82 P.3d at 425. In so holding, the supreme court discussed numerous federal cases considering whether particular disclosure failures constituted evident partiality. *Id.* at 339–42, 82 P.3d at 425–28. The court also discussed, at some length, the differences between party-appointed arbitrators in a commercial arbitration and neutral arbitrators, the gravamen of which was that a "non-neutral" arbitrator, like Swope, may not necessarily be held to the same level of ethical considerations as a "neutral" arbitrator. *Id.* at 342–45, 82 P.3d at 428–31.

The case at bar is, in many ways, dissimilar to *Daiichi Hawai'i*. It appears from the record that all of the arbitrators, including Dr. Tom, were intended to be "neutral" arbi-

---

7. At oral argument, Kaiser also urged us to adopt the Fifth Circuit Court of Appeals' limiting interpretation of *Commonwealth Coatings* in *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278 (5th Cir.2007) (en banc), and, through that narrow lens, to hold that Dr. Tom's relationship with Kaiser is too trivial to warrant vacatur. First, we note that the Fifth Circuit Court of Appeals distinguished its analysis from the Ninth Circuit Court of Appeals' interpretation of evident partiality, which has been adopted and relied on by the Hawai'i Supreme Court and this court. *See, e.g., Daiichi Hawai'i*, 103 Hawai'i at 339, 340, 342, 82 P.3d at 425, 426, 428; *see also, e.g., Sousaris v. Miller*, 92 Hawai'i 534, 542, 993 P.2d 568, 576 (App.1998). Second, the *Positive Software* case is factually distinguishable from the case at bar. *Positive Software* involved a commercial dispute over alleged contract and copyright violations. 476 F.3d at 279. The arbitrator in that case failed to disclose that, *several years earlier*, he and his firm had represented the same party as New Century's counsel in a patent litigation matter that involved *none* of the parties to the *Positive Soft-*

*ware* arbitration. *Id.* at 280. In the course of that *prior* matter, there had been no meetings, telephone calls, hearings, depositions, or trial appearances together, nor *any* other contact between the arbitrator and New Century's counsel, although their names had appeared together on pleadings. *Id.* The Fifth Circuit Court of Appeals held that an arbitration may not be vacated based on an arbitrator's failure to disclose a trivial former relationship between the arbitrator and a party's attorney. *Id.* at 283. This holding is not applicable to the facts before us and we decline to delve further into the Fifth Circuit's analysis of evident partiality. For these reasons, and based on the analysis set forth in this opinion, we decline to rely on the *Positive Software* decision.

8. More specifically, Swope's former representation included asserting the lessors' rights under the subject lease adverse to Daiichi/Kapi'olani Capital, Inc., a subsidiary of Daiichi Hawai'i that was merged into Daiichi Hawai'i, through which merger Daiichi Hawai'i became the lessee. 103 Hawai'i at 331–32, 82 P.3d at 416–17.

trators and there is no argument to the contrary. There were no disclosures whatsoever by Dr. Tom, through which Jeffrey could be held to have had actual or constructive notice of Dr. Tom's ADA activities involving Kaiser. Perhaps most importantly, Dr. Tom's solicitation of money from Kaiser continued, undisclosed, during the pendency of the arbitration and Kaiser sent money to ADA in response to her solicitation, albeit a relatively small amount. Finally, although the Circuit Court concluded in COLs 7 and 8 that Jeffrey waived his rights (1) to challenge Dr. Tom based on any failure to disclose her prior contact with Dr. Hardman,[9] and (2) to challenge Duffy, based on his prior (disclosed) relationship with Dr. Hardman, the Circuit Court did not otherwise conclude that Jeffrey's challenge to Dr. Tom was waived. In contrast to the lessors who filed the appeal in *Daiichi Hawai'i*, arguing that the circuit court in that case erred in concluding that the challenge to Swope was not waived, Kaiser did not file a cross-appeal asserting that the Circuit Court erred in failing to conclude that Jeffrey waived his right to challenge the arbitration award based on Dr. Tom's failure to disclose her dealings with Kaiser (or otherwise argue that Jeffrey waived this issue).

We consider Kay's appeal in light of the overwhelmingly favorable view of arbitration as a means of dispute resolution. *Daiichi Hawai'i*, 103 Hawai'i at 339, 82 P.3d at 425. The effectiveness and cost-saving goals of arbitration can only be realized through efficiencies including strictly limited judicial review. *Id.* Arbitrators wield great power over the scope and nature of the arbitration proceedings and all determinations of fact and law, with virtually no appellate review of their decisions. The fundamental "fairness" of these expansive powers must be grounded in the assurance that neutral arbitrators are indeed neutral and that the arbitrators will disclose any facts that might reasonably cause a party to question the arbitrator's neutrality. The only protection that arbitration parties have against prejudices, biases, or the appearance thereof, is the requirement that an arbitrator must disclose his or her past or existing relationship with the parties, their counsel (or representatives), witnesses, or another arbitrator. "Parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed." *Schmitz*, 20 F.3d at 1047.

The arbitrator's duty to disclose his or her interactions with the parties seems to be particularly important in non-commercial cases like this one. With a typical commercial arbitration agreement, the parties have an opportunity to negotiate arbitration terms and conditions, with the assistance of legal counsel, as part of the give and take of their commercial transaction. Consumers of medical services, like Jeffrey, have little or no reason to believe that their providers' arbitration provisions are negotiable and they must simply have faith in the alternative dispute resolution system, and the justice system that oversees it, to ensure that the process is basically fair. Adequate disclosures are crucial to the appearance of fairness and the integrity of the arbitration system, particularly in the context of cases like this one. The judiciary should play a minimal role in reviewing impartiality. However, the sine qua non for minimal review must be the arbitrator's fidelity to the disclosure obligation.

In this light, we hold that the Circuit Court erred in concluding that Kay failed to establish, by a preponderance of the evidence, that the undisclosed facts concerning Dr. Tom's prior and ongoing relationship with Kaiser, through her ADA activities, created an impression of possible bias or partiality. It is clear to this court that Dr. Tom's involvement with ADA was a significant professional activity that brought her public recognition and enhanced her reputation in the

9. As noted above, Dr. Tom did not specifically disclose that she had been a student in Dr. Hardman's pathology class while she was a student at the University of Hawai'i (**UH**) medical school. Nor did she mention that she and Dr. Hardman served together as faculty members at the UH medical school. However, Dr. Tom's C.V. noted that she attended UH medical school and currently taught there; Dr. Hardman's C.V. noted that he taught at UH medical school. On that basis, the Circuit Court concluded, in COL 7, that Jeffrey "should have known" that Dr. Tom would have had personal contact with Dr. Hardman.

medical profession, although there is no evidence that she received any direct financial benefit from her work with ADA. Dr. Tom herself described her fundraising role for ADA as "significant" and said that her connections at Kaiser would be useful to diabetes organizations in recruiting assistance. Dr. Tom had full knowledge of and actually participated in soliciting donations from Kaiser and represented to others that she had useful connections at Kaiser, all during the pendency of the arbitration. Jeffrey had no actual or constructive knowledge of Dr. Tom's dealings with Kaiser. We reject Kaiser's assertion that Dr. Tom's solicitation of money from Kaiser was too insubstantial to warrant disclosure because ADA Hawai'i only yielded $450 from Kaiser during the pendency of the arbitration and Kaiser's (Hawai'i) contributions to ADA only totaled about $16,500 between 1998 and 2003.[10] Dr. Tom's dealings with Kaiser, although not for her personal financial benefit, were neither isolated nor in the distant past. Dr. Tom had direct and indirect personal contact with Kaiser doctors, nurses and community relations personnel for several years prior to the arbitration, at the time of her appointment as an arbitrator in this case, and continuing through the pendency of the arbitration proceeding.

■ Regardless of the charitable purpose, an arbitrator cannot, as part of a longstanding and on-going activity, ask for and receive money from a party during an arbitration, without disclosing that fact to the other party. However innocent in the mind of the arbitrator, such conduct creates "an impression of possible bias" from the objective view of the other party. *See Daiichi Hawai'i*, 103 Hawai'i at 341, 82 P.3d at 427 (quoting *Commonwealth Coatings*, 393 U.S. at 149–50, 89 S.Ct. 337). It would have been perfectly reasonable and rational for a person in Jeffrey's position to have rejected an

arbitrator who had such connections—if disclosure had been made.

■ As Justice Black stated for the majority in *Commonwealth Coatings*: "We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." 393 U.S. at 149, 89 S.Ct. 337. The burden on Dr. Tom to disclose her dealings with Kaiser at the onset of the arbitration, as arbitrator Duffy disclosed his prior dealing with Dr. Hardman, would have been minimal. The nondisclosure in this case compromised the integrity of the process by which Dr. Tom was chosen. Indeed, it violated the DPR Rules under which the arbitration was conducted, which required Dr. Tom to disclose "any past, present, or possible future relationship with the parties, their witnesses, and their counsel." "When a neutral arbitrator fails to disclose a relationship with one party that casts significant doubt on the arbitrator's impartiality, . . . it is appropriate to assume that the concealed partiality prejudicially tainted the award." *Daiichi Hawai'i*, 103 Hawai'i at 342, 82 P.3d at 428. We conclude that Dr. Tom's failure to disclose her dealings with Kaiser prejudicially tainted the arbitration award in this case.

## V. *CONCLUSION*

For these reasons, we reverse the Circuit Court's October 21, 2005 Confirmation Order. Pursuant to HRS § 658–9(2), the May 28, 2002 arbitration award in favor of Kaiser and against Jeffrey is vacated.

---

**10.** On a national level, it appears that Kaiser contributed between $250,000 and $500,000 annually, during the period of time that Dr. Tom served as president of ADA Hawai'i. However, there is no evidence supporting a connection between Dr. Tom's local fundraising efforts and the donations made to ADA on the national level.